# RICHARD M. PORTER *v.* GENERAL BOILER CASING CO., INC.

[No. 80, September Term, 1978.]

*Decided February 5, 1979.*

*Robert G. Samet,* with whom were *Ashcraft, Gerel & Koonz* on the brief, for appellant.

*Edwin T. Steffy, Jr.,* with whom were *Hooper, Kiefer & Cornell* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We shall here hold that a trial judge erred in granting a motion for summary judgment in that he failed to note that inferences could be drawn from that which was before him contrary to the position of the party in whose favor summary judgment was entered. Thus, the matter could only be resolved by trial.

Appellant, Richard M. Porter (Porter), was injured on the job while employed by appellee, General Boiler Casing Co., Inc. (General). General has its headquarters in North Carolina.[1] It specializes in "lagging" boilers in power plants. ("Lagging" consists in covering a boiler with heat-insulating material.) It was a subcontractor in connection with the construction of the nuclear power plant at Calvert Cliffs in Calvert County.

General wrote to Local Union No. 602 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada

---

1. All of the facts related here are gleaned from the deposition of General's comptroller, to which reference will be made later in this opinion, the exhibits to that deposition, or the pleadings.

(AFL-CIO) (the union) on April 25, 1973, requesting a supply of current reporting forms for that union together with "a copy of the Current Agreement." The letter advised, "Our Company will begin work in your State in the near future and will have need of this information." On May 21, 1974, it addressed another letter to the union stating that General was "a subcontractor for Bechtel Corporation at the Calvert Cliffs Nuclear Power Plant," that the schedule called for it "to start on June 20, 1974," and that General desired a copy of the local's "current contract regarding wages, fringes, subsistence, if any, and reporting forms." The then current contract of the union was supplied in each instance. This contract was one between the Mechanical Contractors D. C. Association, Inc., and the union covering the period September 1, 1972, through April 31, 1975. This union had jurisdiction over steamfitters working in Calvert County.

In July 1974 General sent a superintendent and an assistant superintendent to the Calvert Cliffs job site. In accordance with its usual practice of hiring through local unions in the area in which the current jobsite was located, workmen were hired by General through the union. Wages, both regular and overtime, were paid pursuant to the provisions of the collective bargaining contract previously forwarded to General. General also paid money into various fringe benefit funds established by the union for its members, including health and welfare, pension, apprenticeship, industry, and vacation funds. Most of these contributions were not deducted from hourly wages of employees, but were amounts required by the terms of the collective bargaining agreement to be paid over and above such hourly wages.

Porter was injured on the job. He sought and was awarded compensation under the Maryland Workmen's Compensation Act. Employers by the terms of the agreement with the union are required "to carry adequate workmen's compensation insurance written in such a manner as to provide the same benefits as provided by the District of Columbia Workmen's Compensation Act," which is more generous in its provisions than the Maryland statute.

Porter sued General in equity when he did not receive

compensation as specified in the District of Columbia law. He sought damages on the basis of the difference between the District of Columbia and Maryland rates for two periods of time. His final prayer was for "an order of specific performance requiring [General] to pay [Porter] what [had] accrued ... and to continue paying [Porter] at [the District of Columbia rate] until his temporary partial disability cease[d]." The bill of complaint included an allegation that on the date of Porter's injury General "was party to a valid and binding contract with Steamfitters Local Union # 602," and that under "a so-called excess coverage agreement in effect on the date of [Porter's] injury between [General] and the said union, of which [Porter] was at the time of his injury and still is a member, [Porter] became entitled to receive compensation payments at the same rates as if he was injured in the District of Columbia." The answer of General denied all allegations in the bill of complaint other than the injury by Porter in the course of his employment.

General moved for summary judgment. In addition to the usual allegation "[t]hat there [was] no genuine dispute as to any material fact as to the issues giving rise to [the] Motion" and that General was "entitled to judgment as a matter of law," the motion said that General was not a party to any contract with the union in question as alleged in the bill of complaint. Appended to the motion was an affidavit by General's president saying that he was aware of all contracts between his company and labor unions; that his company was not a party to any contract with this particular union and had never been a party to such contract; that the union was based in the District of Columbia; that the union's contract, as would appear by photostats attached, was with the Mechanical Contractors District of Columbia Association, Inc.; that General was not a signatory to the contract; that General had never been a member of the association; and "that at the time of [Porter's] injury, he was employed by [General] solely for work in the State of Maryland, specifically on a project at Calvert Cliffs, Lusby, Maryland."

Porter immediately countered by serving notice of his intention to take the deposition of the comptroller of General.

Porter then petitioned for an extension until January 11, 1978, in which to answer the motion for summary judgment. He gave as his reason the scheduling of the deposition on December 9, 1977. Oddly enough, the record does not disclose that any extension was granted. However, the deposition was filed on January 6.

Appended as exhibits to the deposition of General's comptroller, in addition to the two letters which we have already mentioned, was correspondence between the comptroller and the attorney for Porter. The first was a letter from Porter's attorney to the comptroller dated November 7, 1974. It referred to Porter's injury on September 6, 1974; the amount he was receiving under the Maryland Workmen's Compensation Act; the benefits specified in the union agreement "even where his injury occurs in Maryland or Virginia"; the amount to which Porter would have been entitled under the District of Columbia act; that counsel had "been advised by [General's] insurance carrier that the policy does not carry an endorsement providing for these excess benefits"; and that as a consequence Porter was obliged to look directly to General. The letter indicated it was intended to confirm a recent telephone conversation and that it was the attorney's "understanding that [the comptroller] intend[ed] to discuss this matter with [General's] insurance agent . . . ." Counsel requested a reply after this conversation had taken place. January 9, 1975, brought a second letter from the attorney to the comptroller seeking advice as to "what position General . . . or [its] insurer intend[ed] to take with regard to the excess benefits to Mr. Porter." Thereafter the attorney wrote yet another letter to the comptroller saying that after his most recent telephone conversation with the comptroller the attorney "advised the local office of Lumbermens Mutual Casualty Company that [General's] local agent had written the excess benefits policy retroactive," but that "[i]n checking this matter [it was] learned the policy was written but to begin on January 11, 1975." The comptroller was advised that obviously "Porter would not be covered by such a policy" and thus it would be necessary to look to General "for payment of these excess

benefits." The comptroller was requested to review his file and to "giv[e counsel the comptroller's] thoughts on this matter as soon as possible." Counsel twice wrote to the comptroller asking whether he had had the opportunity to discuss the matter with General's insurance agent. Finally, on April 11 the comptroller replied:

> Regarding the retro-insurance for Mr. Porter, our insurance agent informed us that it did not start until January 1, 1975. We need to establish a settlement with Mr. Porter for his losses from September 6, 1974, to the time he was able to return to work or January 1, 1975 whichever was first. We need a certified doctor's statement informing us when Mr. Porter was able to return to work.

> The loss settlement will be the difference between what the law requires and the actual payment our insurance company paid. Also, please send proof that Mr. Porter is entitled to the maximum payment under the workmens compensation law.

Counsel forwarded the requested information but this apparently brought no response because on June 30 he advised the comptroller that he had heard nothing from him subsequent to counsel's letters of April 15 and April 18. He then requested information "as to [the] company's position on payment of temporary total disability benefits," with the statement then made that it was his intent to sue if payments were not begun within the next 20 days.

The comptroller's deposition disclosed that he was responsible for "all the financial aspects" of General. He said that General customarily hired local steamfitters and other craftsmen needed for its projects at the time its participation in a specific project began. He described the process:

> Well, usually a job steward [of the union local] is on the job and [General's job superintendent] just go[es] up there and [he] tell[s] him [General] need[s] a certain amount of men, and the men come to the job and we hire them.

One of the comptroller's duties was to prepare cost estimates for bids on projects. In this regard he would contact union locals and determine what the applicable wage rates would be. His purpose in examining such local agreements was to calculate what it would cost General, including fringe benefits, to hire these men. He referred to certain union forms filled out by payroll clerks relative to this particular job and checked by the comptroller each month. These disclosed payments "for the fringe benefits [about which the comptroller had been] speaking ..., welfare, pension, industry funds." He said that when the company goes into an area to do work where there is an existing local collective bargaining agreement General does not sign the agreement but obtains copies of the local agreements with the intention of abiding by the wage rates, the welfare fund rates, the pension fund rates, the apprentice fund rates, and other payroll fringe benefits. He was asked why his company would voluntarily contribute these amounts and replied, "[B]ecause the men would walk off the job, probably. . . . I would guess they would strike, we are dealing with union people." The record also reflects from the examination of the comptroller by Porter's counsel:

> Q So, essentially, you are aware that in order to get these union employees to come out and work for you on the job site, you have to pay them the wages and the fringes provided for in the union contract, is that correct?
>
> A Yes.
>
> Q That if you were to stop paying it or cut their wages, zip, you would lose them, is that correct?
>
> A Sure.
>
> Q Now, if the union were to find out that you weren't deducting these amounts and contributing them into their funds, they would withdraw their employees, wouldn't they?
>
> A Sure, I guess.

In due season Porter filed an answer to the motion for

summary judgment. It alleged that there was a genuine dispute between the parties as to a material fact and:

That although the signature of the defendant was never affixed to the contract upon which this suit is based, the defendant, by its conduct, clearly manifested its intention to be bound by the terms of the contract, and subsequently adhered to the same in all material respects, save the clause upon which this suit is based.

The trial judge at the hearing on the motion for summary judgment asked counsel to tell him "where [there] was ever an implied meeting of the minds between [Porter] and [General]. Between the union and [General]." Ultimately, in granting General's motion for summary judgment, he said:

The company did everything they could to comply with the union contract, was not in my thinking, impliedly, make them impliedly a party to the contract that existed long before they even came to this state. I do not — I just don't see that they have adopted that contract. They are not a party to it. They tried to comply with it so they could use union members, that is fine. But I just don't see how that creates a contract between them and the union without some sort of signature, without some sort of, more of a formative statement we intend to adopt your contract.

Before we reach the issue of summary judgment here, we must first take a look at contract law. The general rule is that one cannot be held to a contract to which he is not a party. *Snider Bros., Inc. v. Heft,* 271 Md. 409, 414, 317 A. 2d 848 (1974), and *Crane etc. Co. v. Terminal etc. Co.,* 147 Md. 588, 593, 128 A. 280 (1925). However, a party may later accept or adopt a contract and thus be bound by it. *Snider* at 414 and *Stavrou v. Beacon Supply,* 249 Md. 451, 456, 240 A. 2d 278 (1968). Thus, what constitutes acceptance becomes the threshhold question. Acceptance can be accomplished by acts as well as words; no formal acceptance is required. *Duplex*

*Envelope Co. v. Balto. Post Co.,* 163 Md. 596, 605, 163 A. 688 (1933). Notification of acceptance is not essential to the formation of a contract. *Chesapeake, etc. v. Manitowoc,* 232 Md. 555, 567, 194 A. 2d 624 (1963).

Two of our prior cases well illustrate conduct which will demonstrate acceptance. In *Snider* the appellant sought to recover commissions for procuring leases for a shopping center pursuant to a written contract. One of the appellees moved for summary judgment, alleging that she had not been a signatory to the contract with the appellant and that, therefore, the contract was not binding upon her. The motion was granted by the trial court. On appeal we said that there was sufficient evidence that she had "adopted or assented to" the contract. The relevant factors were that (1) she signed one of the leases procured by the appellant and (2) she signed a subsequent contract which modified the earlier contract, the one at issue. We held the latter action to be "an express adoption of the earlier contract," *Id.* at 414, and thus she was bound to that contract.

In *Duplex* the defendant signed a written contract and sent it to the plaintiff. The plaintiff wrote a letter to the defendant accepting the contract and stating modifications as to prices. The court said the two writings constituted a new offer. It held that the trial judge erred in taking the case from the jury because the defendant received and kept the two writings, the plaintiff delivered as per the contract, and the defendant accepted such items. Judge Parke observed for the Court, "[A]n acceptance may be indicated by acts as well as by words." 163 Md. at 605.

The trial judge referred to the fact that there was no signature on a contract between General and the union. It should be noted that a signature is not required in order to bring a contract into existence, nor is a signature always necessary to the execution of a written contract. The purpose of a signature is to demonstrate "mutuality or assent" which could as well be shown by the conduct of the parties. 17 C.J.S. *Contracts* § 62 at 732 (1963). "So far as the common law is concerned, the making of a valid contract requires no writing whatever; and even if there is a writing, there need be no

signatures unless the parties have made them necessary at the time they expressed their assent and as a condition modifying that assent." 1 A. Corbin, *Contracts* § 31 at 114 (1963). This general rule has been accepted in Maryland. *See Goszka v. Kleis,* 163 Md. 167, 170, 161 A. 170 (1932). There the four plaintiffs owned land as tenants in common. Two of the plaintiff owners signed a written contract by which they were buying a business in Annapolis from defendants. It required the defendants to purchase land in Baltimore owned by the four plaintiffs. The plaintiffs fully performed. The defendants refused to perform as to the Baltimore land. The trial court sustained a demurrer to the bill of complaint of the plaintiffs for specific performance. Judge Parke said for the Court:

> It is true that the contract was certainly signed by but one of the tenants in common, and not by his wife, who is named in the body of the instrument as one of its parties. The contract, however, was accepted by the other parties in its incomplete form, and partly performed by the party signing, and the defendants have received and enjoy the benefits of this performance, and, under such circumstances, a court of equity would disregard the plainest requirements of justice and ignore a situation replete with equity if it should refuse specific performance on the ground of the incompleteness of the agreement. *Pomeroy on Specific Performance* (3rd Ed.), sec. 145. [*Id.* at 170.]

Accordingly, this Court reversed.

As these cases illustrate, a party's conduct sufficient to manifest acceptance of the terms of a written contract will bind that party to the written contract. "The rule [that an offer may be communicated by conduct or by words, but must be communicated] does not mean that all the terms of the offer must be actually known by the offeree. A man may give his assent to terms when the knowledge of them is merely imputed to him, upon the general principle that notice is often

equivalent to knowledge." W. Brantly, *Law of Contract* § 11 at 24 (2d ed. rev. 1922). "The acceptance of a paper which purports to be a contract sufficiently indicates an assent to its terms whatever they may be, and it is immaterial that they are, in fact, unknown." 1 S. Williston, *Contracts* § 90 A at 292-93 (3d ed., W. Jaeger 1957). Therefore, if General's actions were sufficient to constitute acceptance, that acceptance would extend to all the provisions of the written contract.

Silence can also operate as acceptance. Where "services are rendered under such circumstances that the party benefited thereby knows the terms on which they are being offered [, i]f he receives the benefit of the services in silence, when he had a reasonable opportunity to express his rejection of the offer, he is assenting to the terms proposed and thus accepts the offer." Corbin, *op. cit.,* § 75 at 321.

With that background we turn to an examination of the principles relative to summary judgment. Under Maryland Rule 610 one moving for summary judgment alleges "that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law." The judge considering the motion is to render judgment "forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." As Judge Orth said for the Court in *Washington Homes v. Inter. Land Dev.,* 281 Md. 712, 717-18, 382 A. 2d 555 (1978), "[i]n considering the matter, the duly shown facts which would be admissible in evidence and all reasonable inferences deducible therefrom must be considered in a light most favorable to the party opposing the motion and against the party making the motion. [Citing cases.]" In this instance General was making the motion. It follows, therefore, that the evidence in the deposition and exhibits and the reasonable inferences which might be derived therefrom must be considered in a light most favorable to Porter.

Years ago in *Tellez v. Canton R.R.,* 212 Md. 423, 129 A. 2d 809 (1957), Judge Niles said for the Court:

> The function of the summary judgment procedure is not to try the case or to decide issues of fact. It is merely to determine whether there is an issue of fact to be tried, and if there is none, to cause judgment to be rendered accordingly. [*Id.* at 430.]

We repeated this statement in *Washington Homes,* 281 Md. at 716, citing *Lipscomb v. Hess,* 255 Md. 109, 118, 257 A. 2d 178 (1969). The function of the trial judge on such a motion is said to be much the same as that which he performs at the close of all the evidence in a jury trial when motions for a directed verdict or requests for peremptory instructions require him to determine whether an issue requires resolution by a jury or is to be decided by the court as a matter of law. *Washington Homes* at 716; *Lynx, Inc. v. Ordnance Products,* 273 Md. 1, 8, 327 A. 2d 502 (1974); and *Salisbury Beauty Schools v. St. Bd.,* 268 Md. 32, 41, 300 A. 2d 367 (1973). Moreover, "even where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact." *Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 138, 265 A. 2d 256 (1970), and cases there cited. It follows, accordingly, that if there is a conflict between the inferences which may be drawn from that before the court, summary judgment is not proper.

The trial judge made it abundantly plain that in his opinion in order for General to be bound it was necessary that there be a contract between General and the union with a signature, something "more of a formative statement [from General to the union that] we intend to adopt your contract." In response to this statement the transcript discloses:

> MR. SAMET [counsel for Porter]: Your Honor doesn't feel if the party is aware that the other side assumes they are in the contract, knowing full well that the party is being misled and that his contract is manifesting his assent to the terms of the contract,

he cannot thereby become a party, he has to actually sign something or say he adopts it. If his conduct shows that he adopts, shows that he adopts the contract.

THE COURT: Your perception of His Honor's feelings are one hundred percent correct; yes, that is exactly right. You couched it in better language than I did, Mr. Samet.

MR. SAMET: Thank you, Your Honor.

THE COURT: Motion for summary judgment granted.

In *Rooney v. Statewide Plumbing,* 265 Md. 559, 290 A. 2d 496 (1972), we said:

[W]hen the moving party has set forth sufficient grounds for summary judgment, the party opposing the motion must show with some precision that there is a genuine dispute as to a material fact. This showing must be by facts which would be admissible in evidence. Such a material fact must be one the resolution of which will somehow affect the outcome of the case. *Parklawn v. Nee,* 243 Md. 249, 254, 220 A. 2d 563 (1966). [*Id.* at 563-64.]

The response of Porter to the motion for summary judgment said there was a genuine dispute between the parties as to a material fact and, as we have previously indicated, claimed that General, "by its conduct, clearly manifested its intention to be bound by the terms of the contract, and subsequently adhered to the same in all material respects, save the clause upon which this suit is based." The response of Porter was accompanied by the deposition of General's comptroller and certain exhibits to it by way of correspondence, all intended to support this latter contention. The deposition and exhibits were clearly admissible in evidence. The comptroller was the one who had been directly involved on behalf of General with the union. It was he who prepared cost estimates for bids on projects. He likewise was involved in the exchange of letters between General and Porter's attorney. His testimony clearly indicated General's contribution in accordance with the union

contract to various trust funds maintained by the union for the benefit of its members, a form of fringe benefit. He specifically testified that when General went into an area it obtained information from the union locals in order that it might abide by agreements relative to fringe benefits. He said he was well aware that in order to get these union employees to come to General's jobsites to work it was necessary that union wages and fringe benefits be paid, that if General were to stop paying such benefits it would lose these employees. General's affidavit confined itself to a statement that it had not been "a signatory to said labor contract [or] ... a member of Mechanical Contractors District of Columbia Association, Inc. ...." The testimony of General's comptroller in the deposition and the exhibits filed with it are susceptible of an inference that General intended to be bound by all provisions of the union contract. This would have included providing workmen's compensation benefits on the basis of the District of Columbia statute, a form of fringe benefit. In fact, the correspondence between General and Porter's attorney is susceptible of an inference that it was an oversight that General did not have an insurance policy providing District of Columbia benefits. It would appear that General "locked the stable door after the horse was stolen" by taking out insurance subsequent to Porter's injury to provide such benefits. In these circumstances the case should have gone to trial. Then the trier of fact would determine whether it was General's intent to be bound by the union contract. Therefore, the trial judge erred.

> *Judgment reversed; case remanded to the Circuit Court for Charles County for further proceedings consistent with this opinion; costs to be paid by appellee, General Boiler Casing Co., Inc.*