**BAT MASONRY COMPANY, INC.**

v.

**PIKE–PASCHEN JOINT VENTURE III, et al.**

Civ. A. No. WN–88–1376.

United States District Court, D. Maryland.

March 29, 1993.

Herman M. Braude, Samuel M. Morrison, Jr., and Braude & Margulies, P.C., Washington, DC, for plaintiff.

George D. Ruttinger and Crowell & Moring, Washington, DC, for defendants.

## OPINION

NICKERSON, District Judge.

This is a breach of contract action for the balance due on a construction subcontract, and for delay damages and acceleration costs. The subcontract at issue was one for masonry work on the Special Process Laboratory ["the Project"] built under contract from the U.S. Army Corp of Engineers. Plaintiff Bat Masonry Company, Inc. ["Bat"], a Virginia corporation, is a masonry subcontractor. Defendants Paschen Contractors, Inc., a Delaware corporation and John B. Pike & Sons, Inc., a New York corporation, formed a joint venture known as Defendant Pike–Paschen Joint Venture III ["Pike–Paschen"] in order to bid and build the Project. Defendants Reliance Insurance Company, St. Paul Fire & Marine Insurance Company, and Seaboard Surety Company are sureties un-

der a payment bond provided to the Government by Pike–Paschen. Pike–Paschen asserts a counterclaim for breach of contract, seeking compensation for delays in the Project it claims were caused by Bat.

This Court has jurisdiction in the matter under 28 U.S.C. § 1332(a), by way of diversity of citizenship of the parties and the amount claimed. This Court also finds that, as the contract was executed and performed in Maryland, Maryland law applies.

The Court received extensive testimony and exhibits over the course of a 12 day trial. Following the trial, the Court requested that the parties brief the legal issues regarding liability. Upon consideration of the evidence produced at trial[1] and the argument offered by counsel in the post-trial briefs, the Court makes the following conclusions. The findings of facts and conclusions of law herein relate only to the liability issues raised between the parties and leave determination of precise damages recoverable to a later opinion, if that should prove necessary.

The Court concludes that the following areas require examination:

I. The scope of the terms of the contract between the parties and any breaches thereof. This inquiry requires determinations as to: (A) the time of the formation of the contract; (B) the express terms of the contract; and (C) the implied terms of the contract;

II. The question as to whether Pike–Paschen requested Bat accelerate its performance, and if so, whether Bat is entitled to recover the costs of that acceleration under the terms of the contract and the acceleration request;

III. To what extent Pike–Paschen is entitled to damages for any breach of contract on the part of Bat.

This opinion will also briefly discuss the issues relating to damages in order to provide the parties a potential framework for settlement negotiations or for further briefing to this Court.

## I. THE CONTRACT TERMS

### A. The Time of Contract Formation

The issue of the timing of the formation of the contract is relevant in that it determines, to some extent, the reasonable expectations of the parties under the contract. Bat maintains that it justifiably relied on an April 9, 1986 bar chart schedule provided by Pike–Paschen in determining its costs of performance and in deciding whether to enter into the contract. Pike–Paschen maintains that the contract was formed months before Bat was supplied with the schedule and, therefore, Bat could not have relied on the bar chart schedule in entering the contract.

The parties entered into preliminary discussions concerning this contract in the summer of 1985. At that time, Bat was provided with drawings of the Project and the general parameters of the masonry work to be performed. Bat submitted a bid but heard nothing for several months. In December 1985 Pike–Paschen contacted Bat and informed Bat that the scope of the Project had changed and requested Bat resubmit a bid based on those changes. In January 1986, Bat submitted a bid in the amount of $1,067,500.00. Representatives of Bat testified that the bid was based on an assumption that its masons would be able to achieve a production rate of 160 blocks per mason day, a figure that represented its average performance under average conditions.[2]

---

1. The Court notes at the outset that the credibility of the witnesses varied greatly. At one end of the scale, the Court found the testimony of William Ryals ["Ryals"], the supervising engineer for the Corp of Engineers, to be highly credible and convincing. Also highly credible was the testimony of Jeffrey Abrecht ["Abrecht"], Pike–Paschen's project manager on the Project for most of the period of time in which Bat was on the job. Least credible was the testimony of Joseph Byce, Pike–Paschen's Operations Manager.

2. Pike–Paschen challenged the reasonableness of Bat's submission of a bid without visiting the site and making a more detailed analysis of the costs of the job. Pike–Paschen also sought to make an issue of Bat's inability to locate detailed bid sheets for the job. Pike–Paschen opines that Bat's losses were caused, not by Pike–Paschen induced delays, but by Bat's cursory bidding process.

The Court finds the testimony of Bat representatives, particularly that of Bat's estimator, Ronald Wayne Pack, to be highly credible regarding

On January 24, 1986, Pike–Paschen sent a "Letter of Intent" to Bat stating that "we propose to award your firm" the masonry work on the Project. (Def.Ex. 2). On January 27, 1986, Bat sent a letter to Pike–Paschen which stated, "[w]e are pleased to confirm our quote for the masonry work" and then proceeded to list a number of "Qualifications and Clarifications" regarding the work to be performed. (Def.Ex. 3). The letter concluded, "[i]f you have any questions concerning either our Scope of work or our Qualifications, please feel free to contact us." *Id.* On February 17, 1986, Pike–Paschen sent Bat an unsigned subcontract dated February 14, 1986, and requested Bat execute the contract and return it to Pike–Paschen. (Def.Ex. 8).

Bat did not immediately sign and return the contract. The parties present opposing views as to why Bat delayed. Pike–Paschen contends that the delay was to clear up some confusion regarding the deletion of a wall in Bat's bid. Bat maintains that it was in the process of evaluating the profitability of the project under the proposed schedule and delayed signing the contract until it could be certain of the timing and sequence of the masonry work.

In making that evaluation, Bat claims it relied on the bar chart provided by Pike–Paschen at an April 9, 1986 meeting. (Pltf.Ex. 3). The chart clearly showed the exterior masonry work would begin in August 1986 and would be largely completed before November 1986. Sections of walls were to be completed, according to the schedule, as large sections and in an average of 20 working days per section. The evidence also supports the conclusion that the bar chart was a synoptic representation of the masonry portions of the "baseline" Critical Path Method ["CPM"] schedule for the Project.

In May 1986, Bat, convinced that the schedule was workable and the job profitable, finally signed the contract and returned it to Pike–Paschen. Pike–Paschen executed the contract in early June.

the manner in which Bat generated the bid. Furthermore, the Court finds the bidding process as explained by Bat to be a reasonable method of

Defendants argue that Bat's January bid constituted an offer for a contract and that the January 24, 1986 Letter of Intent constituted an acceptance of that offer. Thus, a contract was formed. Defendants argue that the formality of a signature is not required to form a binding contract, citing *Porter v. General Boiler Casing Co., Inc.*, 284 Md. 402, 396 A.2d 1090 (1979).

Plaintiff argues, and the Court finds, that the contract was not formed until the contract was signed by both parties in June 1986. Although a signature is not required to form a contract, there must be some objective manifestation of the mutual assent of the parties to all material terms of the agreement. Restatement (Second) of Contracts § 18. Regardless of the specific reason or reasons that Bat delayed in executing the contract, it is clear from the evidence presented at the trial that the parties were still in the process of negotiation throughout the Spring of 1986 and that a final agreement had not been reached. The letter of intent was, at most, an agreement to agree. As the court in *Showcase Woodworking Ltd. v. Flour Daniel, Inc.*, Civil No. 89–00656–R, 1990 WL 518129, 1990 U.S.Dist.LEXIS 19614 (E.D.Va.1990), stated under similar facts:

> An agreement to agree is not a contract; just as a proposal to contract is not a contract. A formal written contract is not necessary for the formation of a binding agreement. Nevertheless, the fact that the parties intend to have a formal contract drawn is evidence that they do not intend previous negotiations to amount to a binding contract . . .
>
> . . .
>
> By its clear language, the letter [of intent] states that the parties intend to contract. Once again, an intent to enter into a contract falls short of a binding agreement. It is simply a proposal to contract in the future.

*Id.* at *5–*7.

### B. Express Contract Terms

The masonry subcontract (Def.Ex. 8) contained the following terms:

arriving at a realistic bid, notwithstanding the peculiarities of this job.

Subcontractor shall proceed with the work according to a progress schedule furnished by Contractor, without interference of the work of Contractor or others so that the Contractor and other subcontractors can complete work in accordance with the project schedule.

Subcontract, ¶ 3.

Subcontractor acknowledges that it has been informed that Contractor must complete the General Contract on or before March 16, 1988 and it is therefore, understood and agreed that the Work shall be entirely completed on or before PER PROJECT CPM SCHEDULE. Time is of the essence of this Subcontract.

Subcontract, ¶ 13.

Under these express terms, the performance of the subcontract was to proceed under the project CPM schedule. As noted above, the April 9, 1986 bar chart represented the masonry portion of that schedule. The complete CPM schedule (Pltf.Ex. 20) set forth the basic sequence for the entire project. The CPM schedule indicated that the work was to progress, as could be expected in most any large construction projects, from the bottom, progressing upward. The schedule also indicated when specific areas were to be excavated and backfilled.

Defendants argue that it was understood by all parties that the CPM schedule was to be updated monthly, and therefore, was not a document that was "set in stone." Accordingly, opines Defendants, Bat could not have justifiably relied on either the bar chart or the overall CPM schedule. The Court finds, however, that although the CPM schedule was subject to modification, Bat was justified in the assumption that Pike–Paschen would not *radically* depart from the schedule, *i.e.*, Bat could reasonably assume that Pike–Paschen would not completely resequence the project and work on the upper levels before the lower levels, that Pike–Paschen would not require the walls to be completed in very small segments, or that Bat would be forced to demobilize the job in the middle of the Project.

### C. Implied Contract Terms

In addition to its express terms, the Court finds the subcontract also contained implied terms that were equally binding on the parties. Although Bat gives these implied duties a variety of labels, the Court finds that the contractor's duty is essentially that of reasonable cooperation and support in assisting the subcontractor in the completion of its portion of the work. This duty includes the duty to properly schedule and coordinate the work of subcontractors:

> After trial, the district court found ... that [the contractor] failed to coordinate adequately the work of its subcontractors and that it failed to provide adequate supervisory personnel on the job.... In a construction contract ... the prime contractor implicitly promises to provide such working conditions as may be necessary to allow its subcontractor to carry out its obligations under the contract.... If a contractor interferes with the work of its subcontractor, it has breached its obligation, and the subcontractor is entitled to recover for the resulting delays.

*U.S. v. Klingensmith,* 670 F.2d 1227 (D.C.Cir.1982).

The contractor's implied duty includes the promise not to hinder, delay or interfere with the work of the subcontractor:

> [T]he well established rule [is] that a contractor is entitled to a reasonable opportunity to perform his contract without obstruction or interference, and that neither party will hinder or delay the other party in performance of the contract. As a consequence, delay and improper performance of preparatory work not within the contemplation of the parties at the time the contract is executed will constitute a material breach of this implied obligation.

*S. Leo Harmonay, Inc. v. Binks Mfg. Co.,* 597 F.Supp. 1014, 1027 (S.D.N.Y.1984). *See also Continental Masonry v. Verdel Construction Co.,* 279 Md. 476, 478 n. 1, 369 A.2d 566 (1977) ("[I]t appears fairly well settled that a general contractor is under an implied obligation not to delay or hinder, by his own actions, performance by a subcontractor."); *Glassman Const. Co. v. Maryland City Plaza,* 371 F.Supp. 1154, 1161 (D.Md.1974) ("It

is an implied provision of every contract that the other party promises to co-operate and the failure to do so is a breach. And where a construction contract is breached by delay, the other party is entitled to recover the additional expenses occasioned thereby.").

The scope of the implied duties of the contractor to the subcontractor is well summarized in *Blake Const. Co. v. C.J. Coakley Co, Inc.*, 431 A.2d 569 (D.C.App.1981):

It is well established that there are certain implicit duties between contracting parties, particularly the duty not to prevent performance by the other party. In the case of construction contracts, courts have construed those mutual duties in light of the prevailing practices of the trade and out of deference to the inherent uncertainties of the timing and conditions of the actual performance. However, there is a point at which a contracting party exceeds the necessary latitude of discretionary action, even in construction contracts.

The record of this case is, in our view, replete with evidence that [the contractor] did hinder or prevent [the subcontractor's] performance; scheduled the on-site work in an unreasonable sequence; did not provide a job site in suitable condition for [the subcontractor] to perform its work; and did not cooperate with [the subcontractor] when necessary to assure [the subcontractor's] performance. We are persuaded therefore that the trial judge properly concluded upon this record that these acts collectively and individually constituted a breach of implicit conditions for performance by [the contractor] under the subcontract.

*Id.* at 576–77.[3]

Defendant argues that in the absence of evidence of *wrongful conduct* or breach of an *express* duty under the contract, there can be no liability for breach of implied obligations of cooperation or non-interference. In support of that proposition, Pike–Paschen cites *Ben C. Gerwick, Inc. v. United States*, 285 F.2d 432, 152 Ct.Cl. 69 (1961), "[u]nless the government *expressly* covenants to make the

site available at a particular time, plaintiff has the burden of proving that the United States was *in some way at fault* because the site did not become available to it at an earlier time." *Id.* at 436.

■ This Court disagrees with the Pike–Paschen characterization of the holding in *Gerwick*. The *Gerwick* court's use of the term "at fault" cannot be equated with deliberate "wrongful conduct." The court in *Gerwick* stated,

Plaintiff contends that the contract contained an implied obligation that defendant would affirmatively cooperate to make possible the performance of the work within the contract time, and would not through lack of diligence or negligence delay the work, or render its performance more expensive. *While this is true*, we cannot concur in the plaintiff's position that the Defendant's Officer in Charge was negligent.... Since plaintiff has failed to prove fault *or negligence* on the part of the United States, his claim ... must fail.

*Id.* at 436 (emphasis added). To establish the claim for the breach of the implied duties under the contract, Bat need not establish wrongful conduct; Bat need only establish a sufficient lack of diligence on the part of Pike–Paschen.

### D. Pike–Paschen's Breach of Contract

■ The Court finds that Pike–Paschen breached its contract with Bat. The evidence presented at the trial clearly showed that Pike–Paschen, and not Bat, was responsible for the delays on the Project. Problems in Pike–Paschen's management, the inability to find a suitable subcontractor to do the concrete work, a shortage of concrete forming materials and significant problems in obtaining and installing the required specialized rebar led to substantial delays in Pike–Paschen's provision of the slabs-on-grade upon which Bat was to construct the masonry walls. These delays caused by Pike–Paschen resulted in Bat being required to lay the majority of the exterior walls in the

**3.** The *Blake* court also noted, "The degree to which [the contractor] did or did not follow its CPM ... was indicative but not dispositive of the issue of [the contractor's] failure to sequence work reasonably." *Id.* at 577 n. 3.

winter months, and not in the warmer months as originally contemplated by both parties. The evidence also supports the conclusion that winter masonry work is less efficient than non-winter work and thus, Pike–Paschen's delay resulted in higher than reasonably expected costs for Bat.

The Court also finds that Pike–Paschen's lack of diligence not only shifted the masonry work to the winter months, but also affected the manner in which the work was made available to Bat. The evidence showed that most of the work that was made available was in small "piecemeal" segments, contrary to both the express and implied terms of the contract. Also, the Court finds that the unavailability of sufficient work to allow Bat to economically stay on the job made it necessary for Bat to demobilize the job from mid-November 1986 to mid-January 1987. This piecemeal availability of work and the demobilization of the job also inflated Bat's costs in completing the masonry work.

In order to make up for Pike–Paschen caused delays, Pike–Paschen elected to radically resequence the work on the Project by "going vertical" with the upper levels before the slabs-on grade were poured. Although this resequencing may have been justified as an attempt to bring the Project back on schedule,[4] it further obstructed and interfered with Bat's efforts to complete its masonry work. The resequencing resulted in Bat laying block in tighter, darker confines and in considerably more trade-stacking than would have been required under the original CPM schedule. "Wrapped" columns and the presence of bracing under the upper level slabs further dissected and delayed any available masonry work. Bat could not have anticipated that the Project would have been constructed in the manner in which Pike–Paschen ultimately directed it to be constructed, either at the time it originally submitted its bid, or at the time it finally executed the contract.

Finally, the Court finds that, although the general access to the masonry work on the Project would not have been ideal even under the original CPM schedule, Pike–Paschen's performance as general contractor exacerbated those access problems. Excavations were more extensive and stayed open much longer than contemplated. Because Pike–Paschen delayed making the exterior walls available for masonry, Bat was forced to work those walls when its access was blocked by the staging areas of other subcontractors. Pike–Paschen's aggravation of the access problems constitutes a breach of Pike–Paschen's implied duty under the subcontract and added further to Bat's increased costs of performance.

## II. ACCELERATION CLAIM

■ Bat claims that Pike–Paschen instructed it to "accelerate" Bat's performance of the masonry work on the Project and that Pike–Paschen agreed to reimburse Bat for any additional costs incurred by Bat in accomplishing that acceleration. As the basis for its claim, Bat relies principally on the subcontract and on a March 23, 1987 letter from Jeffrey Abrecht to Bat. (Pltf.Ex. 12). The subcontract provides:

> Contractor may direct subcontractor to work overtime. Provided overtime is not necessary to prevent default by subcontractor in the performance of its obligations, Contractor shall compensate additionally subcontractor for the actual costs incurred by subcontractor for such overtime.

Subcontract ¶ 3.

The Abrecht letter states:

> This letter will serve as notice that our present schedule requires that the exterior masonry walls be expedited. The exterior walls in Areas E, D & C need to be worked simultaneously.

> As we discussed, you are directed to increase your manpower and equipment to facilitate working in the above mentioned areas. Time is of the essence and your cooperation in completing the exterior block walls as soon as possible is required.

---

4. The Court does not understand, much less find support for, Bat's contention that Pike–Paschen's resequencing was a deliberate and sinister attempt to shift, somehow, the burden of the delays from itself to the subcontractor.

The attached schedule shows the required completion dates for your work.

A handwritten notation dated March 24, 1987 and signed by Abrecht appears on the bottom of the letter and states, "[A]ll costs for the above mentioned manpower and equipment will be discussed and negotiated for final settlement at a later date."

The Court finds that this letter represents Pike–Paschen's request of Bat to accelerate the work and an agreement to negotiate in good faith the payment of any additional costs incurred by Bat as a result of that acceleration. Both Wayne Booth, the president of Bat, and Ernie Weatherholtz, the vice president of Bat and Bat's project manager on this Project, testified that the handwritten note at the bottom of the March 23, 1987 letter was added by Abrecht to assure Bat that they would be reimbursed for the acceleration costs after Bat expressed concern that the original letter was not clear enough on that point. Abrecht himself testified that he believed that Bat was entitled to some of the costs for the acceleration effort.

The Court finds untenable Pike–Paschen's contention that the letter was anything but an acceleration request. Pike–Paschen argues that as the time periods under the "expedited" schedule attached to the letter are actually longer than the time periods originally allotted to each task, the letter could not be a request to "speed up" the masonry work. The Court finds that the longer periods are readily explained as a realistic accommodation to the worsened conditions that Bat was then facing. Even with extra manpower and equipment, it would take longer under those changed conditions than it would have without the extra equipment and manpower under the conditions originally contemplated by the parties. The entirety of the evidence only makes sense if the March 23, 1987 letter is construed as a request for Bat to speed up the masonry work, and the March 24, 1987 handwritten addendum is construed as an assurance that Bat would be reimbursed for the attendant costs. The photographs of the jobsite, job records and the testimony of numerous witnesses demonstrate that following Bat's receipt of the letter, Bat increased the number of masons on the job, Bat's masons worked extensive overtime and Bat significantly increased the amount of equipment it had on the job.[5]

## III. PIKE–PASCHEN'S COUNTERCLAIM

Pike–Paschen alleges that Bat breached the subcontract in the following ways: (1) Bat delayed the critical path of the Project by 48 calendar days; (2) Bat's delay resulted in the need to remobilize the Roof–T subcontractor at additional expense to Pike–Paschen; (3) Bat failed to clean up its work area or pay the pro-rata costs of Pike–Paschen's clean up; and (4) Bat failed to provide winter protection as required in the contract.

■ Regarding the first two delay-related claims, the Court concludes that Pike–Paschen presented no credible evidence that Bat was responsible for any material delay in the Project. The evidence did show that Bat was late in constructing the sample panel and tendering other submittals. The evidence also showed, however, that these delays did not delay the start of the masonry work. The court finds that Bat made every reasonable effort to work on walls as soon as they were made available to Bat by Pike–Paschen. William Ryals, the witness that the Court determines to be the most credible and independent, testified that Bat did not delay the CPM schedule in any manner.

■ Regarding the clean up costs, the photographs of the job site strongly suggest that Bat may have been the only subcontractor on the job that did consistently clean up its worksite. Pike–Paschen is not entitled to recover clean up costs from Bat.

■ As for the winter protection, the Court finds that Pike–Paschen has a legiti-

---

**5.** The Court also notes that there was no credible evidence that Pike–Paschen communicated to Bat, prior to March 1987, that Pike–Paschen considered Bat to be the cause of any delay. Had the March 23 letter been a request that Bat make up for delays Pike–Paschen believed Bat to be responsible for, the comprehensive record in this case would certainly have reflected such a communication from Pike–Paschen to Bat.

mate counterclaim for a portion of the costs of the winter protection it provided for Bat. The contract expressly obligated Bat to provide enclosures and heaters for the masonry work. (Def.Ex. 233a, p. 04230–5, ¶ 7.2). Even under the original schedule, a portion of the interior work would have been executed under winter conditions. Therefore, Pike–Paschen is entitled to recover those cost expended on winter protection for those interior walls.

## IV. DAMAGES

It is hoped that this opinion resolving the basic issues of liability will aid the parties in achieving settlement of this case without the need for further briefing and/or argument on the issue of the precise damages to be awarded. Although without that briefing and/or argument, the Court will not make a final determination as to damages, the Court will offer the following general observations as an aid to the parties in achieving an agreement.

(1) Bat is unquestionably due the contract balance of $40,425.90.

■ (2) Bat is entitled to some recovery for the inefficiencies caused by the shift to laying block in cold weather, the excess trade-stacking, the exacerbated access problems, as well as the extended field and home office expenses caused by the delay. The court notes, however, that not all of these inefficiency and delay expenses are recoverable. As the court in *Blake Construction* stated:

> In the case of construction contracts, courts have construed [the parties'] mutual duties in light of the prevailing practices of the trade and out of deference to the inherent uncertainties of the timing and conditions of the actual performance. However, there is a point at which a contracting party exceeds the necessary latitude of discretionary action, even in construction contracts.

431 A.2d at 576.

In other words, there is a range of reasonably expected adverse conditions in the performance of a construction contract within which there is no breach. Bat could expect a certain degree of work delay, trade stacking,

worksite access problems and changes in the work sequence. It is only to the extent that Pike–Paschen's lack of diligence as a general contractor caused those adverse conditions to move outside that "expected" range that Bat is entitled to recovery. Bat admitted that its estimate of 160 blocks per mason-day was based on an average performance; some jobs go better, some go worse. Bat is obviously not entitled to recover for every day its mason laid less than 160 blocks. Pike–Paschen was not the guarantor of the profitability of Bat's subcontract.

Expressed in another way, Bat, as the plaintiff in this action, has the burden of demonstrating that it has incurred its alleged losses by a preponderance of the evidence. Within the range of expected delays and difficulties, Bat does not meet the burden of proving that Pike–Paschen's breach was the cause of Bat's additional expenses. For example, Bat offers inefficiency ratios for two of the periods of masonry work of 30% and 40%. Acknowledging that this determination cannot be reached with absolute precision, the Court finds that 20% of the inefficiency is probably the upper limit that Bat has proven by a preponderance of the evidence to be caused by Pike–Paschen's breach.

(3) Bat is entitled to recover the costs of overtime and additional inefficiencies caused by Pike–Paschen's acceleration request, again, with the same proviso as just stated.

(4) Pike–Paschen is entitled to recover winter protection costs.

(5) Reasonable prejudgment interest is also recoverable to compensate Bat for the loss of the use of its money.