# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

TELECOM AMERICA, INCORPORATED,
          *Plaintiff-Appellant,*

v.

ONCOR COMMUNICATIONS,
INCORPORATED, a Delaware
Corporation,
          *Defendant-Appellee,*

and

NATIONAL OPERATOR SERVICES,
INCORPORATED, a Maryland
Corporation,
          *Defendant.*

No. 01-1765

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CA-98-679-AW)

Argued: February 28, 2002

Decided: March 19, 2002

Before WIDENER and MOTZ, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Affirmed by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Alan C. Thomas, FISCHER, PORTER, CALIGUIRE &
THOMAS, P.C., Englewood Cliffs, New Jersey, for Appellant. Jef-

frey Martin Schwaber, STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C., Rockville, Maryland, for Appellee. **ON BRIEF:** Arthur L. Porter, Jr., Jay D. Fischer, Scott H. Goldstein, FISCHER, PORTER, CALIGUIRE & THOMAS, P.C., Englewood Cliffs, New Jersey, for Appellant. Alexia Kent Bourgerie, STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C., Rockville, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

### OPINION

PER CURIAM:

In this diversity action, Telecom America, Incorporated, sues Oncor Communications, Incorporated, for breach of contract, unjust enrichment, and various related torts. The district court granted Oncor summary judgment on Telecom's breach of contract claim, and, after Telecom presented its evidence, judgment as a matter of law on Telecom's remaining claims. Telecom appeals; we affirm.

### I.

Oncor provides long-distance telephone service. To build its customer base, Oncor entered into a contract with National Operator Services, Incorporated (NOS), under which NOS agreed to solicit owners of public telephone sites onto the Oncor network. NOS, in turn, entered into a contract with Telecom, under which Telecom directly solicited sites for NOS. Periodically, Oncor would determine the call activity of each site assigned to the network by NOS, and pay NOS a commission. NOS then remitted a percentage to Telecom for sites Telecom had referred; Telecom, finally, would pay a percentage back to site owners for the right to continue serving as their agent (i.e., for authorization to switch their sites from one long distance service to another).

In the Spring of 1995, a dispute arose between Oncor and NOS, and on June 30, Oncor stopped making commission payments to NOS. NOS sued Oncor in state court, and at the same time suspended payments to its site solicitors, including Telecom. Consequently, Telecom attempted to obtain payment from Oncor.

Telecom and Oncor engaged in a series of conversations, at the end of which Oncor wrote Telecom a letter dated July 13, 1995. The letter briefly described the relationship between NOS and Telecom, and then stated, in pertinent part:

> NOS has informed Telecom America that it will not pay all or any portion of the commissions and surcharges due to Telecom America on July 15, 1995 (the "July Payment"). Based upon such statement by NOS you [Telecom] have contacted Oncor to determine if Oncor would be willing to pay Telecom America the July Payment owed to Telecom America by NOS.

> Based upon the representation and agreements made by Telecom America and contained in this letter, Oncor will agree to pay to Telecom America the July Payment. You will provide Oncor with such documents as may be reasonably requested by Oncor, including a list of all public pay phone Sites brought to Oncor through the efforts of Telecom America, so that the parties can calculate and Oncor can verify the amount properly due to Telecom America. Once Oncor and Telecom America agree upon the amount due to Telecom America by NOS, Oncor shall pay such amount. Telecom America covenants and agrees to pay the Sites all sums do [sic] and owing to such parties.

> Oncor will continue to make such payments to Telecom America each month for so long as (i) NOS fails to pay all sums properly due to Telecom America pursuant to the Agreement [between NOS and Telecom], and (ii) no legal or regulatory action is taken which would prohibit or limit Oncor's ability or right to make such payments. Telecom America covenants and agrees that for so long as Oncor makes payments on behalf of NOS, that Telecom America

> shall not move any of its Sites off of the Oncor network and
> further agrees that it will not solicit any public pay phone
> customers on the Oncor network and attempt to move them
> to another operator service provider.
>
> Telecom America acknowledges and agrees that the pay-
> ments made by Oncor are an accommodation to Telecom
> America and Oncor is not in any way assuming ongoing lia-
> bility or obligations under Telecom America's Agreement
> with NOS. . . .
>
> If you agree with the terms and conditions set forth in this
> letter, please acknowledge your acceptance by signing this
> letter in the space provided below and returning an original
> to me for Oncor's files.

Although no representative of Telecom ever signed the July 13 let-
ter, on July 17 Telecom sent Oncor a database of its 8,000 active and
inactive sites, including contact names, phone numbers and addresses
of the site owners as well as the contract terms, and commission
arrangements between Telecom and the site owners. On July 21,
1995, however, NOS obtained an order from the state court, effective
July 17, compelling Oncor to pay into an escrow account all money
"due and payable to [NOS'] sites and subagents" and prohibiting
Oncor from having any "direct contact with" the site owners or sub-
agents. Five days later, in a letter dated July 26, Oncor informed Tele-
com that "[b]ased upon the Court's [July 17] order, Oncor must
retract any offers made by Oncor in its July 13, 1995 letter." Telecom
nevertheless kept its sites on the Oncor network for some unspecified
length of time and, to date, Oncor has never paid any commissions
or surcharges to Telecom for these customers.

On August 21, 1995, NOS and Oncor settled the suit NOS had
brought against Oncor in state court. According to the terms of that
settlement, Oncor (1) forgave NOS $1,908,906 of prepaid commis-
sion debt and (2) paid NOS $436,000. On the next day, NOS sent
Telecom a proposed release requiring NOS to pay Telecom $65,074
(an amount equal to the commissions owed to Telecom for the month
of May 1995) in exchange for Telecom's acknowledgment that it had
been paid all past commissions and that "all claims, past, present and

future, are hereby waived." Telecom and NOS executed this agreement without material change, and NOS made the agreed-upon payment to Telecom.

According to Telecom, Oncor then "began directly soliciting Telecom's customers," using both the data it had "tricked Telecom into providing," and also an "authorization" it had received from NOS allowing it "to circumvent NOS and its subagents, i.e., Telecom, and deal directly with the site owners that they provided."

On April 20, 1998, Telecom filed this action against both NOS and Telecom, alleging that it was entitled to payment from both companies under several theories. In May 1999 the district court granted Oncor summary judgment on Telecom's claim that Oncor breached a contract it had entered into with Telecom. On May 3, 2000, Telecom settled with NOS. A bench trial on Telecom's other claims against Oncor began on May 7, and at the close of Telecom's case Oncor moved for judgment as a matter of law pursuant to Rule 52(c). The court granted the motion and Telecom appeals.

We review the district court's grant of summary judgment on the breach of contract claim de novo. As to the other claims, on which the district court granted judgment as a matter of law pursuant to Rule 52(c), we review the court's findings of fact for clear error and its conclusions of law de novo. *See Carter v. Ball*, 33 F.3d 450, 457 (4th Cir. 1994). The parties agree that Maryland law governs their dispute.

## II.

Telecom contends that Oncor's July 13, 1995 letter constituted a contract between the parties, which it fully performed and Oncor breached. Specifically, Telecom maintains that the letter "contained unilateral promises by Oncor that invited Telecom's acceptance by performance," and that Telecom performed (i.e., sent its database disk to Oncor) according to the terms spelled out in the letter. Brief of Appellant at 27. However, in the July 13 letter Oncor specifically notified Telecom: "[i]f you agree with the terms and conditions set forth in this letter, *please acknowledge your acceptance by signing this letter* in the space provided below and returning an original to me for Oncor's files." (Emphasis added). The letter also contained a

space for Telecom to sign under the words "ACCEPTED AND AGREED TO BY." Telecom never signed or returned the letter, and so the district court held that, as a matter of law, no contract was formed.

Telecom contends that this holding was error. The company relies on *Porter v. General Boiler Casing Co., Inc.*, 396 A.2d 1090 (Md. 1977), for the proposition that "in certain circumstances signatures are not required to bring a contract into being." Brief of Appellant at 27. Of course this is true, but those "circumstances" are limited. As the Court of Appeals of Maryland explained in *Porter*, "there need be no signatures *unless* the parties have made them necessary at the time they expressed their assent and as a condition modifying that assent." 396 A.2d at 1095 (emphasis added). Given the plain language of the July 13 letter, it does not appear that the district court erred in concluding that in this case signatures were necessary.

But even assuming that the July 13 letter did constitute a contract between the parties, Oncor's obligations under the contract were either conditional or fully performed. The July 13 letter stated that Oncor was not obligated to make payments if any "legal or regulatory action is taken which would prohibit or limit Oncor's ability or right to make such payments." Shortly thereafter, the state court issued an injunction barring such payments. The letter also made clear that Oncor's payments were entirely derivative of NOS's liability; that is, Oncor agreed to pay only so long as "NOS fails to pay all sums properly due to Telecom America pursuant to the Agreement [between NOS and Telecom]." When Telecom accepted a settlement from NOS on August 23, it waived all of its past and future claims arising from its contract with NOS. Therefore, Oncor's derivative liability also came to an end.

For all of these reasons, the district court did not err in granting Oncor summary judgment on Telecom's breach of contract claims.

### III.

Alternatively, Telecom maintains that Oncor was unjustly enriched when it received and used Telecom's confidential information, and

retained Telecom's sites on the Oncor network, without compensating Telecom.

Under Maryland law a plaintiff must prove three elements to make out an unjust enrichment claim:

> 1. A benefit conferred upon the defendant by the plaintiff;
>
> 2. An appreciation or knowledge by the defendant of the benefit; and
>
> 3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

*Mass Transit Admin. v. Granite Const. Co.*, 471 A.2d 1121, 1125 (Md. Ct. Spec. App. 1984) (quoting *Everhart v. Miles*, 422 A.2d 28 (Md. Ct. Spec. App. 1980)).

The district court held that Telecom had failed to prove the third element — that Oncor retained a benefit without payment in circumstances in which it was inequitable to do so. Specifically, after careful consideration of Telecom's evidence, the court found that Telecom had not proved unjust enrichment because it had "voluntarily" made its decisions, "knowing the risk involved." The court reasoned that Telecom "had an opportunity to take back the phones, to switch the phones, but for a business decision decided it wasn't practical." Rather, Telecom "received a business benefit by leaving the phones there, because [the company] felt ultimately [it] would get a deal out of it and would get paid [its] commissions." In sum, the court concluded, "[a] restitution claim is not available under . . . circumstances where a plaintiff voluntarily made the decision knowing the risk involved in getting commissions or not getting commissions."

Ample evidence supports these findings and the district court did not err in concluding that, given these facts, Telecom had not demonstrated that it would be inequitable to permit Oncor to retain, without payment, any benefit it received from the Telecom's sites and assertedly confidential information.

IV.

Telecom also maintains that Oncor misappropriated Telecom's trade secrets when it retained Telecom's customer data base. The Maryland Uniform Trade Secrets Act defines a "trade secret" as information that (i) derives "independent economic value" from "not being generally known" or "readily ascertainable" by others who can obtain economic value from its use or disclosure; and (ii) is the subject of "efforts that are reasonable under the circumstances" to maintain the secrecy of the information." *See* Md. Code Ann. Com. Law II § 11-1201(e) (Michie 2000).

In this case, as the district court found, Telecom did not make reasonable efforts to keep its database secret. Telecom produced no evidence of any agreement, procedure or other measure instituted to guard against unauthorized disclosure of this information. And, the Telecom employee entrusted to compile and disseminate the information to Oncor received no instructions concerning its alleged confidential nature. *Cf. Motor City Bagels, L.L.C. v. The American Bagel Co.*, 50 F. Supp. 2d 460, 480 (D. Md. 1999) (company did not meet secrecy requirement when it failed to exact secrecy agreements from potential investors and the exclusivity language was ineffective).

Nor, again as the district court found, did Telecom prove that there was a "misappropriation," that is, "acquir[ing] the trade secret by improper means or disclos[ing] the trade secret without express or implied consent." *Diamond v. T. Rowe Price Assocs., Inc.*, 852 F. Supp. 372, 412 (D. Md. 1994). Under the Uniform Trade Secret Act, "improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." § 11-1201(b). In determining that Oncor did not obtain the lists by "misappropriation," the district court expressly found that Oncor had perpetrated "no fraud in asking for this information," and indeed, had made "no false representation of material fact." Rather, Telecom sent the information "hoping that [it] would ultimately reach an agreement or under the impression that [it] had a deal." Again, abundant evidence supports these findings. Thus, there was no misappropriation and Telecom's trade secret claim fails on two grounds.

V.

Telecom further maintains that Oncor intentionally interfered with contracts between Telecom and its site owners.

Under Maryland law, competition is "just cause for damaging another in his [or her] business," and "a competitor who intentionally causes a third person not to continue an existing contract terminable at will does not improperly interfere with the contractual relation if no wrongful means are employed." *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 119, 121 (Md. 1994) (quoting *Natural Design Inc. v. Rouse Co.*, 485 A.2d 663, 676 (Md. 1984)). In the instant case, Telecom concedes that its contracts with site owners were terminable at will, and that Oncor's aim was to "market ANIs" directly, without recourse to agents or subagents. In other words, Oncor intended to compete directly with Telecom for site owners' business.

Telecom asserts that Oncor is nevertheless liable because it used wrongful means: that Oncor "tricked" Telecom to turn over customer lists, obtained the right (from NOS) to deal directly with site owners, and then used Telecom's "trade secrets" (i.e., customer lists) to contact site owners. But, as already noted, *supra*, the district court made factual findings, fully supported by record evidence, that Oncor did not "trick" Telecom and that Telecom's customer lists were not trade secrets. The district court also found that Telecom did not produce any other evidence "of any malicious, deliberate, intentional, willful interference." Accordingly, the district court did not err in granting judgment on the intentional interference claim.

VI.

Finally, Telecom contends that Oncor fraudulently induced it to provide confidential contact information about its sites and to keep its sites on the Oncor network. The district court generally found that Oncor did not knowingly make any false representation of material fact. With respect to the specific allegation of fraud — the testimony from Telecom's principal that, in sum, "they didn't perform, they rescinded, they canceled the deal" — the court found that this fell well short of fraud under Maryland law. Moreover, the court expressly found that the reason Oncor did not move forward with the

deal "was . . . a court order." "And on top of that, on the 26th of July of 1995 there was a clear retraction letter," barring any reliance by Telecom "on any so-called misrepresentation." As explained within, the evidence at trial well supported these findings; accordingly, the court did not err.*

## VII.

For the foregoing reasons, the judgment of the district court is in all respects

*AFFIRMED*.

---

*Given our conclusion that all of Telecom's liability claims fail, we need not address its contentions that the district court erred in finding its damages claims too speculative, in refusing to grant an accounting, and not permitting additional time to designate an expert on damages.