Affirmed by published opinion. Chief Judge TRAXLER wrote the majority opinion, in which Judge AGEE joined. Judge WYNN wrote a dissenting opinion.
TRAXLER, Chief Judge:
Jacqueline Galloway appeals a district court order dismissing her action against Santander Consumer USA, Inc. seeking damages for breach of contract and alleging a violation of the Maryland Credit Grantor Closed End Credit Provisions (the “CLEC”), see Md.Code, Comm. Law §§ 12-1001, et seq. Finding no error, we affirm.
I.
The pertinent facts in this case are undisputed. Galloway used a loan she obtained through a retail installment contract (“the RISC”) to finance her purchase of a vehicle in March 2007. The CLEC governs the RISC’s terms.
The RISC contained the transaction’s financing terms as well as information concerning repossession rights and procedures. It listed the total amount financed as $22,916.28 and required Galloway to make 72 payments of $487.46 on the 17th day of every month. If a payment or part thereof was more than 15 .days late, the RISC called for imposition of a late fee of five dollars or ten-percent of the part of the payment that was late, whichever was greater. The RISC also included a modification provision stating that “[a]ny change *82 to this contract must be in writing and we must sign it.” J.A. 20.
The RISC was assigned to CitiFinancial Auto, Ltd. (“CitiFinancial”), which took a security interest in the vehicle. Sometime before October 31, 2008, Galloway contacted CitiFinancial requesting a reduction in the amount óf her monthly loan payment. The CitiFinancial representative with whom Galloway spoke told her that CitiFi-nancial would send her paperwork to review and sign and that, once she returned the signed papers, the company would consider whether to approve her request. Galloway stated that CitiFinancial told her they would notify her in writing concerning whether her request had been approved.
CitiFinancial then provided Galloway with a cover page and a two-page document. The cover page asked that she “review the attached documents and provide the signature(s) required.” J.A. 25. It requested that after she signed the paperwork, she “return [it] to CitiFinancial Auto for further review, approval and consideration.” J.A. 25. It also requested that she “retain a copy of this agreement for [her] records.” J.A. 25.
The two remaining pages constituted an amended agreement (the “Amended Agreement”). Under its terms, the Amended Agreement would take effect on October 31, 2008; Galloway’s total amount due would be $20,213.50; her monthly payment would be reduced from $487.46 to $365.57; her first payment would be due December 14, 2008; and her last (and seventy-second) payment would be due on November 14, 2014. The Amended Agreement also included an arbitration agreement (the “arbitration'agreement”) under which Galloway, CitiFinancial, and CitiFi-nancial’s assignees, could elect to arbitrate any dispute, “whether in. contract, tort or otherwise,” rather than proceed through a court action.[1] J.A. 26-27. The arbitration agreement also prohibited Galloway from serving as a class representative or participating in a class action if arbitration was elected. Finally, the Amended Agreement provided that “all terms and provisions of the [RISC] shall remain in full force and effect- except as expressly modified herein.” J.A. 26.
Galloway signed the Amended Agreement on November 12, 2008, and sent a copy of the signed agreement to CitiFinan-cial via fax.
The record does not reflect that CitiFi-nancial' ever specifically sent Galloway written approval of the Amended Agreement. Nevertheless, Galloway states in her declaration that “sometime after November 14, 2008, CitiFinancial lowered [her] scheduled monthly payments to $366.43,” J.A. 17, an amount just 86 cents more than the amount contemplated in the Amended Agreenient. Galloway immediately began making monthly payments of $366.43 beginning December 13, 2008,' and continued to make payments in that amount for several years.
In her declaration, Galloway states that it was an “agreement between [her] and CitiFinancial entered into sometime after November 14, 2008” that lowered her payment amount from $487.46 to $366.43. J.A. 17. However, the record contains no evidence of any specific discussions between Galloway and CitiFinancial explaining or addressing the 86-cent discrepancy. And Galloway’s - declaration asserts that the agreement that “lowered [her] payments to $366.43 each month was not evidenced by a writing.” J.A. 17.
*83 In December 2011,. CitiFinancial assigned the security interest in Galloway’s vehicle to Santander Consumer USA, Inc. After Galloway fell behind on her payments, Santander repossessed her car, sold it, and, after failing in its attempts to collect the outstanding deficiency, waived the deficiency.
Galloway subsequently brought this action in state court, alleging that Santander breached the RISC and violated . the CLEC by failing to provide sufficient notice before selling her vehicle. Galloway purports to bring suit on behalf of herself and all persons similarly situated.
Santander removed the case to federal district court. Santander also filed a motion to compel arbitration and stay federal district court proceedings undér the Federal Arbitration Act (“FAA”), 9 U.S.C. §§ 1 et seq., claiming Galloway had previously agreed to arbitrate any disputes concerning her loan. Galloway denied that the parties had an agreement to arbitrate and alternatively claimed that any arbitration agreement was unenforceable under the FAA because it was not in writing. Galloway also ihoved to amend her complaint, and Santander opposed the motion on the basis that amendment would be futile.
Applying a summary-judgment-like standard, the district court concluded as a matter of law that Galloway had agreed to arbitration and that the agreement to arbitrate was enforceable under the FAA. See Galloway v. Santander Consumer USA, Inc., Civ. No. CCB-13-3240, 2014 WL 4384641 (D.Md. Sept. 3, 2014). The district court analyzed several alternative legal theories offered by Santander as support for its position that the parties agreed to arbitration. The court concluded that CitiFinancial’s sending the Amended Agreement to Galloway was a mere invitation for Galloway to make an offer because the company retained the right at that time to reject Galloway’s refinancing application even if Galloway signed the agreement. See id. at *3. However, the court concluded that Galloway’s returning a copy of the executed agreement constituted an offer to enter into the agreement and that CitiFinancial accepted that offer by reducing her monthly payment to only 86 cents more than the agreement had called for. See id.
Alternatively, the court concluded, that CitiFinaneial’s proposal to reduce the payment to $366.43 constituted a counteroffer to make a minor modification to the dollar amounts in the Amended Agreement, which Galloway accepted by making the payments in the amount requested for several years without objection. See id. The district court rejected Galloway’s argument that no new contract was formed because Galloway’s returning a signed original of the Amended Agreement to Ci-tiFinancial and CitiFinancial’s written assent were both conditions precedent to modifying the RISC. See id. at *4. The district court concluded that the parties waived any right they may have had to such formalities by virtue of their performance under their new agreement. See id. The court added that, under the doctrine of equitable' estoppel, Galloway could not disclaim the Amended Agreement, having accepted the benefit of the agreement in the .form of reduced monthly payments. See id.
■Having determined that the parties bound themselves to the terms of the Amended Agreement, or at least to the terms of the Amended Agreement with the slightly modified payment amount, the court concluded that the written arbitration agreement was enforceable under the *84 FAA.[2] See id. at *3 n. 4. On that basis, the court initially granted Santander’s motion to compel arbitration and stayed the case pursuant to 9 U.S.C. § 3. See id., at *5. However, on reconsideration, the court, citing Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc., 252 F.3d 707, 709-10 (4th Cir.2001), entered a final judgment dismissing the case so as to allow Galloway to pursue an immediate appeal.
II.
“We review de novo the district court’s judgment compelling arbitration, as well as any questions of state contract law concerning the validity of the arbitration agreement.” Santoro v. Accenture Fed. Servs., LLC, 748 F.3d 217, 220 (4th Cir.2014).
“Sections 3 and 4 [of the FAA] ... provide two parallel devices for enforcing an arbitration agreement: a stay of litigation in any ease raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4.” Chorley Enters. v. Dickey’s Barbecue Rests., Inc., 807 F.3d 553, 563 (4th Cir.2015) (alteration and internal quotation njiarks omitted). Before the FAA was en-abted, “courts were hostile to the enforcement of arbitration provisions, following a long-standing common law rule which evolved from the judiciary’s jealous refusals to oust courts of jurisdiction in favor of other dispute resolution mechanisms.” Whiteside v. Teltech Corp., 940 F.2d 99, 101 (4th Cir.1991). “The purpose for enacting the FAA was to assure judicial enforcement of privately made agreements to arbitrate by placing them upon the same footing as other contracts.” Id. (internal quotation marks omitted). This purpose is served by the cause of action the FAA provides and its “primary substantive provision,” Moses H. Cane Mem’l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), declaring, with exceptions not relevant here, that
[a] written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, ... shall be valid, irrevocable, and enforceable.
9 U.S.C. § 2.
We have stated that “[application of the FAA requires demonstration of four elements: ‘(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.’ ” Rota-McLarty v. Santander Consumer USA Inc., 700 F.3d 690, 696 n. 6 (4th Cir.2012) (quoting Whiteside, 940 F.2d at 102).
Only the second element is at issue here. Galloway does not dispute that the present action falls within the scope of the arbitration agreement, but she argues that the district court erred in concluding, without the benefit of a jury trial, that the provision was a term of any contract she and CitiFinancial entered into. She also alternatively maintains that if the arbitration agreement was a term of a contract the parties entered into, the district court erred in ruling that their acceptance of that provision satisfied the FAA’s writing *85 requirement. We address these issues se-riatim.
A.
We- first address Galloway’s contention that she is entitled to a jury trial regarding whether she and' CitiFinancial entered into a binding contract that included the arbitration agreement.-
Under the FAA, “the party seeking a jury trial must make an unequivocal denial that an arbitration agreement exists — and must also .,. provide sufficient evidence in support of its claims such that a reasonable jury could return a favorable verdict under applicable law,” Chorley Enters., 807 F.3d at 564. Thus, “to obtain a jury trial, the parties must show genuine issues of material fact regarding the existence of an agreement to arbitrate.”[3] Id. We conclude that the district court properly ruled that no such factual issue existed here.
The parties agree that principles of Maryland law control the question of whether they reached an agreement to arbitrate. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (“When deciding whether the parties agreed to arbitrate a certain matter ..., courts generally ... should apply ordinary state-law principles that govern the formation of contracts.”); see Chorley Enters., 807 F.3d at 563.
Under Maryland law, a prerequisite to the formation of a contract is mütual assent between the parties. See Cochran v. Norkunas, 398 Md. 1, 919 A.2d 700, 708 (2007). “Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms.” . Id.
“A contract is formed when an unrevoked offer made by one person is accepted by another.” County Comm’rs for Carroll Cnty. v. Forty W. Builders, Inc., 178 Md.App. 328, 941 A.2d 1181, 1209 (Spec.App.2008) (internal quotation marks omitted). “An ‘offer’ is the ‘manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.’” Prince George’s Cnty. v. Silverman, 58 Md.App. 41, 472 A.2d 104, 112. (Spec.App.1984). Importantly, an acceptance may be manifested by actions as well as by words. See Porter v. General Boiler Casing Co., 284 Md. 402, 396 A.2d 1090, 1095 (1979) (“The purpose of a signature is to demonstrate ‘mutuality or assent’ which could as well be shown by the conduct of the parties.”).
As it did below, Santander offers several theories concerning how a meeting of the minds occurred here. Santander first argues that CitiFinaneial’s sending Galloway the Amended Agreement for her signature amounted to an offer to enter the agreement, and that Galloway’s signing it and faxing, a copy to CitiFinancial constituted her acceptance of the Amended Agreement. Just, as the district court did, we reject this, argument because CitiFinancial made clear to Galloway, both orally and in writing, that it retained the right to deny Galloway’s request for lower monthly payments. Since CitiFinancial had not agreed that Galloway’s execution of the Amended Agreement would bind the parties, the sending of the agreement to Galloway for her signature was a mere invitation to Galloway to make an offer. See Spaulding v. Wells Fargo Bank, N.A., 714 F.3d 769, 778 (4th Cir.2013) (“[W]hen some further act of the purported offeror is necessary, the purported offeree has no power to *86 create contractual relations, and there is as yet no operative offer.”, (internal quotation marks .omitted)), . Thus, Galloway’s execution of the Amended Agreement and her sending of a copy of-the signed document to CitiFinancial ■ constituted not an acceptance of an offer made to her, but rather an offer to CitiFinancial to enter into the agreement.
Santander alternatively contends that the district court correctly ruled that Citi-Financial accepted Galloway’s offer by lowering 'the amount of Galloway’s monthly payment to 86 cents more than the amount the Amended Agreement specified, a difference described by the district court as “de minimis.” Galloway, 2014 WL 4384641, at *3. Galloway argues, however, that CitiFinancial’s actions did not constitute an acceptance of her offer because, under Maryland law, any variation from the terms offered is considered to be a conditional acceptance or counteroffer,, as opposed to an unconditional acceptance that would immediately create a binding agreement.[4]
Even assuming arguendo that Galloway is correct that CitiFinancial’s actions did not bind the parties to an agreement, we agree with the district court’s, alternative ruling that CitiFinancial’s actions proposing payments in an amount 86 cents more than the amount specified in the Amended Agreement constituted a Counteroffer to modify the terms of the Amended Agreement in this minor way and that Galloway accepted the counteroffer by making the payments in this slightly increased amount.
Although Galloway contends that the question of whether a meeting of the minds occurred presented a genuine factual dispute, we conclude that the.legal consequences of the parties’ undisputed actions are clear. When Galloway first inquired about lowering the amount of her monthly payment, CitiFinancial drafted the Amended Agreement and instructed her-that if she signed it and returned it, the company would review her request. Galloway indicated her assent to the company’s proposed terms when she executed the Amended Agreement ‘ on November 12, leaving CitiFinancial to undertake its formal review process. Within approximately one month, at some time early enough to allow Galloway to make her December payment- in the new amount, CitiFinancial informed Galloway that it would lower Galloway’s payment to $366.43, almost the exact amount that the Amended Agreement had contemplated. On these facts, CitiFinancial could not reasonably be understood to be offering Galloway the option to her lower payment amount without accepting the other new terms specified in the Amended Agreement — such as, for example, the increase in the number of payments that Galloway would be required to make. Rather, Citi-Financial could only be reasonably understood to be proposing, a very minor tweak to the terms that it had originally suggested and that Galloway had already indicated she would accept. See Learning Works, Inc. v. Learning Annex, Inc., 830 F.2d 541, 543 (4th Cir.1987) (“Maryland law ... requires unqualified acceptance of an offer before a contract can be formed. If a purported acceptance varies from the terms of the offer, then it does not operate as an acceptance, but rather as a rejection of the offer and a counteroffer.”).[5]
*87 There is no evidence that Galloway ever explicitly agreed to accept this small modification to the Amended Agreement. Nevertheless, her making payment in the revised amount CitiFinancial requested and then continuing to make those payments for several years without complaint can only be interpreted as an assent to the terns of. the Amended Agreement as slightly modified by the company. See Restatement (Second) of Contracts § 19(2) (“The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.”); see also Cochran, 919 A.2d at 714 (indicating that offeree’s silence can constitute acceptance if the offer-ee has accepted the benefit of the offer); Restatement (Second) of Contracts § 53(3) (cmt. b) (1981) (noting that offeree may guard against the risk that his performance will constitute an unintended acceptance; he can simply communicate to the offeror that he does not intend to assent). This was not a case, after all, in which the parties were engaging in baek-and-forth negotiation over what the terms of a new agreement would be. Galloway asked Citi-Financial if it would modify the RISC to lower her required monthly payment amount. In the context of the parties’ dealings, it was CitiFinancial’s decision whether it would agree to do so, and,, if so, what new terms it would accept. Then Galloway would decide whether she would also accept those terms. CitiFinancial initially proposed., terms ..in an Amended Agreement that it would consider if Galloway returned the signed document to the company. When, after its formal review process, CitiFinancial proposed a slight change in the dollar amounts, Galloway assented to that change as well.
Galloway argues that, under Maryland law, the parties could not validly modify the RISC without setting out all of the new terms together in a written document and signing the document; In support of her argument, Galloway maintains that a signature on a contract is a condition precedent if “the terms of the contract make the parties’ signatures a condition precedent to the formation of the contract.” All State Home Mortg., Inc. v. Daniel, 187 Md.App. 166, 977 A.2d 438, 447 (Spec.App.2009); see also Chirichella v. Erwin, 270 Md. 178, 310 A.2d 555, 557 (1973) (explaining that a condition precedent is “a fact,' other than mere lapse of time, which, unless excused, must exist or occur before a duty of immediate performance of a promise arises”) (internal quotation marks omitted). While[1] that legal proposition is correct, no term in the Amended Agreement indicated that CitiFi-nancial’s signature was necessary to bind the parties, and Galloway does not contend otherwise.
Galloway does not suggest that when CitiFinancial agreed to reduce her payment to $366.43, the company indicated *88 that any further paperwork would be forthcoming or that any additional signatures would be needed to complete the parties’ modification of the terms of the RISC. All CitiFinancial sought from Galloway was payment in the new amount. By making her December payment in that amount and continuing to make payments in that amount for several years, she accepted the terms CitiFinancial had offered. See Porter, 396 A.2d at 1095; Restatement (Second) of Contracts § 30(2) (1981) (“Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances.”).
The only contractual language Galloway cites as the basis for her position that a written agreement signed by both parties was necessary to effectively modify the RISC is the language in the RISC itself stating that any future amendment would need to be by a signed writing. However, under Maryland law, contractual limitations on future modifications are not effective to prevent parties from entering into new agreements orally or by performance; rather, they only provide context for interpreting subsequent conduct. See Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC, 421 Md. 94, 25 A.3d 967, 978-83 (2011) (Maryland “caselaw shows a persistent unwillingness to give dispositive and preclusive effect to contractual limitations on future changes to that contract ... whether it is mutual modification, novation, waiver of remedies, or ... a waiver of condition precedent”); University Nat’l Bank v. Wolfe, 279 Md. 512, 369 A.2d 570, 576 (1977) (holding that parties may modify their original agreement by their conduct “notwithstanding a written agreement that any change to a contract must be in writing”); see also Porter, 396 A.2d at 1095 (explaining that formation of a contract does not require the parties’ signatures “unless the parties have made them necessary at the time they expressed their assent and as a condition modifying that assent ” (emphasis added and internal quotation marks omitted)).
Here, as we have explained, the parties left no doubt that they intended to modify the terms of the RISC, even in the absence of a signed writing memorializing all of the new terms to which they agreed. Having led CitiFinancial to believe for many years that the parties had successfully amended the RISC even without a signed writing — and having accepted the benefit of the modification in the form of substantially lower monthly payment requirements — Galloway cannot now be heard to claim that there was no valid amendment in the absence of a signed writing. See Hovnanian, 25 A.3d at 979 (waiver of a provision requiring amendments to a contract to be in writing may be by express agreement or by implication).[6] Accordingly, the district court properly concluded that the arbitration *89 agreement was a term of a contract that the parties entered intd.
B.
In addition to her state-law arguments, Galloway also maintains that any arbitration agreement that the parties entered into is not enforceable under the FAA. We disagree.
The FAA declares, with exceptions not relevant here, that
[a] written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, ■... shall be valid, irrevocable, and enforceable.
9 U.S.C. § 2. We have stated that “[ajppli-cation of the FAA requires demonstration of,” among other things, “a written agreement that includes an arbitration provision which purports to cover the dispute.” Rota-McLarty, 700 F.3d at 696 n. 6 (internal quotation marks omitted). As we-have explained, the record demonstrates as a matter of law that Galloway, by making payments in the amount CitiFinancial requested, bound herself to the terms of the written Amended Agreement, with a slight modification in the dollar amounts that is not included in the writing. The question this case presents is whether the fact that the Amended Agreement, and specifically the arbitration agreement, were in writing was sufficient to satisfy the FAA’s writing requirement, or rather, whether the parties’ non-written modification of a separate term of the agreement rendered the arbitration agreement unenforceable. We conclude that the writing requirement was satisfied.
The “written arbitration agreement” that is necessary to bring an agreement within the FAA’s scope is an “actual document — the physical embodiment of the underlying legal obligations” and need not include- any written assent to those obligations. Seawright v. American Gen. Fin. Servs., 507 F.3d 967, 978-79 & nn. 5-7 (6th Cir.2007) (holding that FAA’s writing requirement was satisfied when pamphlet distributed to employees contained arbitration provision and stated that an employee’s continuing employment would constitute acceptance of the procedures); see In re Cotton Yarn Antitrust Litig., 505 F.3d 274, 281 n. 5 (4th Cir.2007) (holding that when agreement to arbitrate was incorporated under the UCC into terms of oral contracts because it was established that arbitration is a usage of trade, and subsequent written confirmations containing the details of the .arbitration terms became part of the contract by operation of law, the confirmations satisfied the FAA’s writing requirement);. Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1369 (11th Cir.2005) (holding FAA’s writing requirement was satisfied when, “[although the employees’ acceptance was by continuing their employment and was not,in writing, all material terms — including the manner of acceptance — were set forth in the written” dispute resolution policy); International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 416 (4th Cir.2000) (‘While a contract cannot bind parties to arbitrate disputes they have not agreed to arbitrate, it does not follow that under the Federal Arbitration Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision. Rather, a party can agree to submit to arbitration by means other than personally signing a contract containing an arbitration clause.” (alterations & internal quotation marks omitted)); Fisser v. International Bank, 282 F.2d 231, 233 (2d Cir.1960) (“[T]he [FAA] contains no built-in Statute of Frauds pro *90 vision but merely requires that the arbitration provision .itself be in writing. Ordinary contract principles determine- who is bound by such written provisions.” (footnote omitted)). Because the arbitration agreement was in writing and Galloway assented to be bound by that agreement when she made payments in the amount CitiFinancial requested, it does not matter, for purposes of enforceability under thé FAA, that she also assented to other terms that may not have been in writing. Stated another way, although no writing documented CitiFinancial’s minor change to the Amended Agreement’s dollar amounts, the parties were not required to draft an integrated writing documenting this minor change in order to make the written arbitration agreement enforceable under the FAA. See Medical Dev. Corp. v. Industrial Molding Corp., 479 F.2d 345, 348 (10th Cir.1973) (“[I]t [is] ■ not necessary that there be a simple integrated writing or that a party sign the writing coiitaining the arbitration clause. All that is required is that the arbitration provision be in writing;” (citations omitted)). The district court was therefore correct to enforce the arbitration' agreement.
III.
In sum, because we conclude that the district court correctly enforced the parties’ arbitration agreement, we affirm the district court order dismissing Galloway’s action.

AFFIRMED

. The arbitration agreement provided that it did not apply to certain types of disputes, but Galloway does not maintain that any of those exceptions applies here.

. The court also concluded that Galloway’s proposed amendment of her complaint would be futile. See Galloway v. Santander Consumer USA, Inc., Civ. No. CCB-13-3240, 2014 WL 4384641, at *5 (D.Md. Sept. 3, 2014).

. We have noted that “[t]his standard is akin to the Burden on summary judgment.” Chorley Enters. v. Dickey's Barbecue Rests., 807 F.3d 553, 564 (4th Cir.2015).

. Galloway also argues that the fact that Citi-Financial charged her a late fee on November 3 in accordance with the terms of the RISC demonstrated, for several reasons, that CitiFi-nancial had not accepted the terms of the Amended Agreement by that date.

. We note that the record does not reflect whether CitiFinancial’s communication to *87 Galloway informing her that it would lower her payment to $366.43 was oral.or in writing. Galloway’s declaration states that the agreement that "lowered [her] payments to $366.43 was not evidenced by a writing.” J.A. 17. It is unclear whether Galloway meant that CitiFinancial informed her orally that it would lower her payment to that amount or rather merely that there was no writing setting out all of the terms of the parties' new agreément. Regardless, the means by which CitiFinancial informed Galloway of the amount of . her new monthly payment is not material to' our decision.
Additionally, although the reason for the 86-cent increase is also not material to our decision, the increase may be attributable to a late fee of $48.74 imposed on November 3, 2008, when Galloway failed to make her October payment in a timely manner, which increased the total amount she owed on her loan.

. Additionally, because the parties agreed on a monthly payment of $366.43, the terms to which the parties manifested assent were sufficiently definite. Galloway argues that there was some uncertainly regarding the date that monthly payments were due, but that is not correct. The Amended Agreement plainly provided that Galloway's payments were due on the 14th of every month. Galloway contends that CitiFinancial changed this date, as evidenced by the fact that the RISC provided that late fees would be incurred if payments were more than 15 days late, yet after December 2008, CitiFinancial often imposed late fees 15 days, rather than 16 days, after the due date. However, CitiFinancial had often been charging late fees exactly 15 days after the payment due date since the initiation of the loan. Regardless of whether that was proper under the' parties’ agreements, the continuation of that practice after December 2008 was no indication that the payment due date had somehow changed from that provided in the Amended Agreement.

. It is, therefore, inaccurate to suggest that the record contains "no evidence,” ante at 82, of discussions between Galloway and CitiFi-nancial.