No. 20-0007 – *SER Troy Group, et al. v. Sims*

**FILED**
**November 20, 2020**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WORKMAN, J., dissenting:

In what has become a disturbingly regular occurrence, the majority has substituted itself as lower court judge and jury, engaging in fact-finding and applying its factual determinations to render a determination the lower court declined—all under the auspices of extraordinary relief.[1] Despite the existence of significant disputed issues of fact regarding whether a valid arbitration agreement was formed, the majority simply resolves the factual dispute by crediting facts it deems relevant and dismissing (if not omitting) those it does not. The majority's opinion is replete with credibility determinations about which explanations and allegations are "minimal and unpersuasive" or "self-serving," and those which it finds "compelling" and "relevant." The majority fails to even dignify the proper procedural mechanism for resolving factual disputes regarding the formation of an arbitration agreement and mischaracterizes the issue as an evidentiary one. Instead, it states summarily that the "circuit court had the authority to determine the

---

[1] *See Goodwin v. Bd. of Educ. of Fayette Cty.*, 242 W. Va. 322, 331, 835 S.E.2d 566, 575 (2019) (Workman, J., dissenting) ("Once again, under the guise of appellate review, the majority resolves issues which are underdeveloped below and in so doing renders this Court an adjudicatory body." (footnote omitted)); *State ex rel. Universal Underwriters Ins. Co. v. Wilson*, 241 W. Va. 335, 355, 825 S.E.2d 95, 115 (2019) (Workman, J., dissenting) (encouraging "full processing of a . . . legal issue by its being fully considered by a lower court, a lower court making a ruling, the parties then briefing and arguing the issue at the appellate level"); *State ex rel. Gallagher Bassett Servs., Inc. v. Webster*, 242 W. Va. 88, 99, 829 S.E.2d 290, 301 (2019) (Workman, J., concurring in part and dissenting in part) (discouraging premature resolution of "legal issues that hinge on facts" in prohibition).

1

existence of a valid arbitration agreement" and proceeds to simply decide the issue itself. However, "[t]o be sure, genuine issues of fact preclude [] judgment when determining whether there is an agreement to arbitrate, just as they do when determining the existence of any other contract." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London,* 584 F.3d 513, 532 (3d Cir. 2009). Because the majority resolved these issues of fact here, rather than remanding for the fact-finder's resolution, I dissent.

In this case, petitioner Troy Group ("Troy") produced an arbitration agreement purportedly bearing respondent Nakita Willis' ("Ms. Willis") signature. Ms. Willis initially averred that she did not recall signing any such agreement and, ultimately, affirmatively swore that she did not sign it. Ms. Willis explained that she became convinced that she did not sign the agreement (rather than simply not recalling) after confirming that she was represented by counsel in an unrelated employment matter at the time the agreement was purportedly signed and would have been wary of such an agreement and would not have likely signed away her right to a jury trial. Nowhere in the majority's opinion is this amplification of Ms. Willis' recollection mentioned; rather the opinion disingenuously states that Ms. Willis "has not given any explanation as to why her recollection suddenly was contrary" to her initial affidavit.

More importantly, Ms. Willis demonstrated that both her arbitration agreement and those executed in this particular time frame were highly suspect. Ms. Willis' agreement was among the very first such arbitration agreements required by Troy—

2

a practice allegedly beginning in 2004. Aimee Orum, Troy's Director of Human Resources, testified that the agreements are customarily countersigned by a Troy representative contemporaneous with the employee's signature, an unwritten policy. Indeed, documents from 2006-forward (after Ms. Orum became employed in 2005) are consistent with this practice and bear no other irregularities. This indicia of trustworthiness in the 2006-forward agreements stand in stark contrast to the sketchy details surrounding the scant, four 2004 initial agreements, of which Ms. Willis' agreement is a part.

Only one arbitration agreement had allegedly ever been signed before Ms. Willis'—one month prior to hers. The employee's signature was dated on a Sunday and the agreement bore no countersignature from a Troy representative, contrary to Troy's custom and policy. Ms. Willis' agreement, dated a month later in March 2004, likewise bore no countersignature from Troy's representative, also contrary to Troy's custom and policy. The third agreement—allegedly signed only three months later—reveals a clear pattern of back-dating and/or "back-signing" of these first agreements more than a decade later. The agreement contains the signature of the "Director of HR," "Aimee R. Orum," and is dated June 11, 2004. On that date, Aimee Orum 1) did not even work for petitioner; and 2) went by "Aimee Olmstead." Ms. Orum would not work for petitioner until one year later, would not go by "Aimee Olmstead" until seven years later, and would not be the Director of HR until *eleven to twelve years later*. The final arbitration agreement allegedly

3

signed that year, was not present in the employee's file as of 2017, but was later produced in 2019; that employee also denies outright having signed it.[2]

Nowhere are these details given any consideration in the majority opinion.[3] Moreover, nowhere in the record does Troy offer testimony to provide any supporting details whatsoever about Ms. Willis' alleged execution of the agreement. As indicated above, Ms. Orum did not even work for Troy at the time Ms. Willis' agreement was purportedly signed. Instead, Troy rests its case entirely on the existence of the agreement itself. Obviously then, whether the agreement was actually executed by Ms. Willis is the issue for resolution and is hotly disputed.

Rather than acknowledging the credibility and factual determinations necessary to resolve that dispute, the majority opinion labors mightily with presumptions regarding the existence of an agreement (which Ms. Willis does not challenge) and invokes various Rules of Evidence regarding the requirement of originals, duplicates, and general matters of authenticity. However, the issue presented is not an evidentiary one. It is an

---

[2] Testimony of Ms. Orum also revealed that the originals had been destroyed after scanning into Troy's system and that she had lone editing access to the agreements.

[3] The lone reference to the irregularities surrounding these agreements is a passing mention of "backdating" and a footnote describing the final employee's agreement, stating simply that he did not recall signing an agreement and it was not previously located in his file. The majority dismisses this contention as "self-serving" because this employee was engaged in an employment dispute with Troy. Somehow, even this dismissal of counter-vailing evidence apparently did not alert to the majority that it was engaging in classic credibility determinations dedicated exclusively to the finder of fact.

4

issue of contract formation, i.e. is the arbitration agreement presented authentic and therefore reflects the formation of an agreement to arbitrate or is it a *post-hoc*, cobbled-together document which lacks Ms. Willis' assent to arbitrate? This is the threshold issue presented to the circuit court and is a necessary antecedent to requiring arbitration: whether Ms. Willis assented to arbitration. *See New v. GameStop, Inc*., 232 W. Va. 564, 572, 753 S.E.2d 62, 70 (2013) (analyzing contract formation issues to determine "mutual assent or meeting of the minds with respect to arbitration. West Virginia contract law requires mutual assent to form a valid contract."). Shockingly, the majority fails to so much as mention the words "mutual assent" or "formation" anywhere in its opinion.

It is well-established that "[w]hether an arbitration agreement was validly formed . . . [is] evaluated under state law principles of contract formation." *State ex rel. Richmond Am. Homes of W. Va., Inc. v. Sanders*, 228 W. Va. 125, 134, 717 S.E.2d 909, 918 (2011). It is also well-understood, black-letter law that

> [f]ormation of a contract is generally a question of fact for the trier of fact to resolve. More specifically, where one party to an action affirms and the other denies the existence of a contract, and the evidence introduced is conflicting, but there is evidence from which a contract may be inferred, the jury should determine the fact of the existence or nonexistence of the contract.

Blum, George, L. et al, 75A *Am. Jur. 2d Trial* § 655 (2d ed. 2020) (footnotes omitted). Further, "[t]he authenticity of an instrument is a fact question for resolution by a jury, including the question whether a document was altered after it was signed. Controverted

5

questions of fact include whether the document was forged and whether the signatures are genuine." *Id*. at § 652 (footnotes omitted).

Exclusively focusing on the lower court's finding that there were "significant and troubling questions [] with regard to the authenticity of the agreement"—Troy's lone evidence in support of the existence of an agreement to arbitrate—the majority opinion spirals down a rabbit hole of inapposite evidentiary Rules. But, as indicated above, the majority misapprehends the lower court's use of the term "authentic" as suggesting an evidentiary issue. The challenge to the agreement's authenticity goes to whether a contract was *formed*, i.e. was there *mutual assent* to arbitrate, not whether the document is of such quality as to warrant introduction into evidence under our Rules. Indeed, the majority does not even intimate of a proceeding in which evidence would be introduced, much less challenged under the Rules of Evidence.

This Court has previously debunked precisely the confusion the majority demonstrates regarding the interplay of the Rules and factual issues regarding authenticity:

> "Rule 901(a) is intended to simplify and liberalize the authentication process. Thus, once the party offering the evidence makes a prima facie case, *the question of authenticity is for the fact finder*[.]" *W. Va. R. Evid*. 901 simply requires a trial judge to find that a reasonable juror could find that the evidence is what its proponent claims. Once the trial judge makes this determination, *the rest is up to the trier of fact*.
>
> This analysis does not ignore the purpose behind the authentication requirement; rather the analysis recognizes the function of the trier of fact[.]

*State v. Jenkins*, 195 W. Va. 620, 624, 466 S.E.2d 471, 475 (1995) (citations omitted) (emphasis added). Simply stated, the issue is not whether the arbitration agreement produced by petitioners was properly admitted as evidence under authenticity and original writing Rules, but rather whether Ms. Willis' challenge to the agreement's authenticity was sufficient to create an issue of fact regarding whether she assented to arbitration. *See Schoendorf v. Toyota of Orlando*, No. 6:08-cv-767-Orl-19DAB, 2009 WL 1075991, at *11 (M.D. Fla. Apr. 21, 2009) ("Plaintiff cannot be bound by the Arbitration Agreement in this case because she did not sign it or intend to be bound by it."). "Authenticity" of the agreement in this case, is *demonstrative of mutual assent* because it is the lone evidence Troy submits in support of the agreement to arbitrate. Given the serious and legitimate issues raised with respect to whether Ms. Willis signed and therefore assented to arbitration, the issue is one for a trier-of-fact to resolve before arbitration may be compelled.

The Federal Arbitration Act (also not mentioned in the majority opinion) makes this clear:

> If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof. . . . Where such an issue is raised, the party alleged to be in default may . . . *demand a jury trial of such issue*, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. *If the jury find that no agreement in writing for arbitration was made* or that there is no default in proceeding thereunder, the proceeding shall be dismissed. *If the jury find that an*

7

*agreement for arbitration was made* in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

9 U.S.C.A. § 4 (1954). As the 8th Circuit further explained:

Indeed, the FAA provides that "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." "If no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine such issue." At times, a district court may "decide the arbitration question as a matter of law through motions practice and viewing the facts in the light most favorable to the party opposing arbitration." To this end, "the [FAA's] summary trial can look a lot like summary judgment." However, *if the motions record reveals a material issue of fact*, the FAA maintains that the court move summarily to trial. And, when that trial is not demanded by the party opposing arbitration, "the court shall hear and determine such issue."

*Nebraska Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 743 (8th Cir. 2014) (citations omitted) (emphasis added). Nowhere does the majority opinion examine the true error of the lower court and, in fact, duplicates it—the failure to send the formation issue to a jury or, absent a request for a jury, to engage the lower court as a finder of fact to resolve the issue. [4]

When a party challenges the formation or existence of a valid agreement to arbitrate,

---

[4] The record does not reflect whether Ms. Willis requested a jury trial of this issue. Absent that, a fair reading of the lower court's order would suggest that it acted as the trier of fact and found against Troy, resulting in an affirm under a deferential standard of review.

[u]nder the FAA, "the party seeking a jury trial must make an unequivocal denial that an arbitration agreement exists—and must also . . . provide sufficient evidence in support of its claims such that a reasonable jury could return a favorable verdict under applicable law."

Thus, "to obtain a jury trial, the parties must show genuine issues of material fact regarding the existence of an agreement to arbitrate."

*Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 85 (4th Cir. 2016) (footnote and citations omitted). *See also Boyles v. Langmore Capital, LLC*, No. 1:20-CV-545, 2020 WL 4719282, at *3 (M.D.N.C. Aug. 13, 2020) (noting that "defendants have presented evidence that Mr. Boyles electronically signed agreements to arbitrate. Mr. Boyles has presented evidence that he never saw the agreements and did not sign them. Thus, the record creates [] disputed questions of material fact . . . . To resolve these disputed questions of material fact, a trial is required under Section 4."); *Hilton v. Fluent, LLC*, 297 F. Supp. 3d 1337, 1341 (S.D. Fla. 2018) ("[O]nce an agreement to arbitrate is put 'in issue,' the Federal Arbitration Act provides that the court 'shall proceed summarily to the trial thereof' and that '[i]f no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine such issue.' 9 U.S.C. § 4."); *SSC Selma Operating Co., LLC v. Gordon*, 56 So.3d 598, 603 (Ala. 2010) ("Mrs. Gordon filed a response to the defendants' motions to compel arbitration and attached to the response her affidavit, in which she denied that she had signed an arbitration agreement with SSC. . . . Mrs. Gordon's affidavit constitutes sufficient evidence that the arbitration agreement did not exist. Therefore, a

9

genuine issue of material fact has been raised concerning the existence of the arbitration agreement.").

Finally, the majority cites several highly distinguishable cases in support of its apparent position that production of an arbitration agreement, even in the face of a denial of signature and demonstrable irregularities, is sufficient to compel arbitration. First, it cites to a recent memorandum decision where this Court compelled arbitration in the face of a signature denial. The majority opinion fails to note that the Court found that, despite plaintiff's denial, "the only way the digital signature appears on the document was for respondent to have entered her password that she created into the portal that was emailed to her—a password that she testified she would not have shared with anyone else." *Employee Res. Grp., LLC v. Collins*, No. 18-0007, 2019 WL 2338500, at \*5 (W. Va. June 3, 2019) (memorandum decision). The same is evident from the extra-jurisdictional cases cited. In each, the employee presented nothing more than a blanket denial of signature and failed to produce any additional evidence calling the veracity of the agreements into question; in most, compelling evidence of the *impossibility* of forging or imposing the employee's signature was presented by the employer.

How these cases remotely resemble the instant case is a mystery. Ms. Willis has produced *admitted* evidence of back-dating and back-signing agreements by the sole person with editing access to these electronically-stored agreements. She has produced evidence that her agreement was one of the first and has no corroborative countersignature

like virtually all of the subsequent agreements, in violation of company custom and practice. Finally, she has presented disputed evidence as to why she would not have signed such an agreement: her involvement in unrelated employment litigation and being represented by counsel at the time the agreement was allegedly signed.

The majority has conflated the formation or mutual assent issue presented in this case with an evidentiary issue and failed to even dignify the existence of and procedure for handling the factual dispute underlying the case. As a result, it has issued a signed opinion which suggests that an employer with sole possession of an arbitration agreement is virtually immune from any denial that the agreement was signed by the employee. Its credibility and factual determinations are grossly improper and cast a long shadow over our body of caselaw mandating that arbitration agreements be afforded the same consideration as any other contract. Accordingly, I respectfully dissent.